**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARTIN J. WALSH, SECRETARY OF LABOR,⁣ )
⁣ )
⁣ Plaintiff,⁣ )
⁣ )
vs⁣ )⁣ Civil Action No. 2:20-138
⁣ )
⁣ )⁣ Magistrate Judge Dodge
UNITED STATES POSTAL SERVICE,⁣ )
⁣ )
⁣ Defendant.⁣ )

**<u>MEMORANDUM OPINION</u>**

Plaintiff Martin J. Walsh, the United States Secretary of Labor ("the Secretary"), brings this action under Section 11(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(c), against Defendant, the United States Postal Service ("USPS"), alleging that USPS violated the law when it fired a postal employee in retaliation for having reported a work injury. USPS denies that it is liable for the claims asserted.

Pending before the Court is the motion for summary judgment of USPS. For the reasons that follow, the motion will be denied.

**I.   <u>Relevant Procedural History</u>**

The Secretary commenced this action in January 2020.[1] Federal question jurisdiction is based upon the Section 11(c) claim, 28 U.S.C. § 1331; 29 U.S.C. § 660(c)(2). (Compl. ¶ 1.) (ECF No. 1.) Section 11(c)(2) allows the Secretary (but not private individuals) to bring suit against employers. The Secretary has delegated to the Assistant Secretary for Occupational Safety and Health "the authority and assigned responsibility for administering the safety and

---

[1] When the Complaint was filed, the Secretary of Labor was Eugene Scalia. Subsequently, Acting Secretary of Labor Milton Al Stewart became the named plaintiff. During the briefing of the pending motion, the parties noted that the new Secretary of Labor, Martin J. Walsh, has been substituted as the Plaintiff pursuant to Fed. R. Civ. P. 25(d).

health programs and activities of the … Act." See Secretary's Order 3-2000, 65 Fed. Reg. 50017 (August 16, 2000). Investigations are conducted by investigators from the Occupational Safety and Health Administration ("OSHA").

On September 15, 2021, after the completion of discovery, USPS moved for summary judgment (ECF No. 48), which has been fully briefed (ECF Nos. 43, 50, 53).

## II.  Factual Background

### A.  Holland's Employment

On or around January 23, 2016, Justin Holland began working for USPS as a City Carrier Assistant ("CCA"). CCAs are noncareer letter carriers who deliver and collect mail. (Defendant's Statement of Facts in Support of the Motion for Summary Judgment ("DSFS") ¶¶ 1-2.) (ECF No. 49).

Holland worked mostly out of the Upper St. Clair Post Office during his employment with USPS. Doug Prozzoly was the acting supervisor of the Upper St. Clair Post Office in 2016 until David Disciascio became the supervisor of the Upper St. Clair office in March 2016. At certain periods throughout 2016, Prozzoly was the acting supervisor when Disciascio was on detail or training at other USPS facilities. Disciascio and Prozzoly, as supervisors, reported to the Manager of the Upper St. Clair office, Mike Priore. (Plaintiff's Response to Defendant's Statement of Facts ("PRDSF") ¶¶ 71-76.) (ECF No. 51.)

While USPS states that the first 90-day period of a CCA's employment is a probationary period (DSFS ¶ 3), the Secretary highlights deposition testimony to the effect that 90 days is typical, but USPS can and has extended probationary periods for employees who are struggling with their duties. (PRDSF ¶ 3.)

As stated in the Collective Bargaining Agreement (CBA) of the postal workers' union, the National Letter Carrier's Association ("NALC"), during the 90-day probationary period:

> CCAs may be disciplined or removed within the term of their appointment for just cause and any such discipline or removal will be subject to the grievance arbitration procedure, provided that within the immediately preceding six months, the employee has completed ninety (90) work days, or has been employed for 120 calendar days (whichever comes first) of their initial appointment. A CCA who has previously satisfied the 90/120 day requirement either as a CCA or transitional employee (with an appointment made after September 29, 2007), will have access to the grievance procedure without regard to his/her length of service as a CCA. Further, while in any such grievance the concept of progressive discipline will not apply, discipline should be corrective in nature.

(DSFS ¶ 4.) According to the Secretary, to the extent that USPS relies on this provision to imply that CCAs are not subject to discipline during their probationary period, this is inaccurate. NALC Branch 84 President Ted Lee testified that he has been involved in discipline concerning probationary employees. (PRDSF ¶ 4.)

There is conflicting evidence regarding the possibility of extending the probationary period of a CCA. Manager Priore testified that extension of the probationary period is not permitted. (DSFS ¶ 5.) However, Manager of Customer Services Operations Maureen Gerst Stewart testified that she has agreed to extend probationary periods many times. In addition, Ken Pawloski, Human Resources Manager for the Western Pennsylvania District, testified that Human Resources has contacted the union a few times to ask if it would agree to extend the probationary period of an employee struggling with performance. Union President Lee testified that management often reaches out to him to extend probation for employees struggling with performance issues and that he would contemplate extending a probation if the carrier did not have the opportunity to hold down a delivery route or to case during the probationary period.

(PRDSF ¶¶ 5, 101.)[2]

### B. Holland's Performance and USPS Evaluation Process

According to USPS, Holland had numerous performance problems during his probationary period as a CCA. In March 2016, Disciascio, Holland's supervisor, noted that Holland had made mis-deliveries, failed to carry his satchel and was slow completing his assignments. (DSFS ¶ 6.) The Secretary notes that the document cited by USPS in support of this statement (ECF No. 45 Ex. E) is an unsigned, undated document that is inadmissible. Moreover, Priore indicated that it was not typical for observations to be recorded this way and that the document inaccurately states that Disciascio spoke to him on a Saturday. (PRDSF ¶ 6.)

Holland has denied ever receiving negative feedback about his performance other than Prozzoly telling him he needed to case mail faster when he first began casing. (PRDSF ¶¶ 92-96.) It is undisputed that USPS never reached out to the union to extend Holland's probationary period or never raised any concerns with the union about Holland prior to his injury. (*Id*. ¶¶ 102, 105.)

Disciascio completed a Driver Observation form and both a 30 and 60-day review dated April 9, 2016, that rated Holland as "unsatisfactory" in various respects. Disciascio sent the Driver Observation form by email to Maureen Gerst, Michael Priore and Deb Gless, his supervisors. USPS contends that it was common for the 30 and 60-day evaluations to be simultaneously prepared and that the form was considered a "working document" so that edits and additions could be made during the probationary period. (DSFS ¶¶ 7-10, 12-14.) Disciascio's email also contained positive remarks about Holland's performance.

---

[2] To "case mail" means: "To sort mail into a case. To place letter and flat mail into the separations of a carrier case [or] to place flat mail in delivery sequence outside a case using the delivery order shown for the letter mail." https://about.usps.com (Postal Terms).

The evaluation form (ECF No. 45 Ex. G) has a space for the CCA to initial, but Disciascio wrote that Holland refused to initial it. According to USPS, CCAs are evaluated based upon supervisor observations and, although supervisors are required to review the performance with the CCA, the supervisor is not required to inform the employees that they are being observed and the CCA is not required to sign the evaluation forms. (DSFS ¶¶ 15-17.)

The Secretary disputes that Disciascio actually evaluated Holland and completed these forms on April 9, 2016. He contends that neither Holland nor NALC ever received a copy of the Driver Observation form until a subsequent investigation, despite the fact that supervisors are required to provide a copy of this form to the CCA after observation. The union also should have received a copy when it filed a grievance on Holland's behalf. Holland states that he was never given any such forms while he was employed with USPS and that Disciascio did not discuss his performance with him on April 9 or ever asked him to sign an evaluation form. At any rate, he asserts that he would not have refused to sign a performance evaluation during his probationary period because he believed that he would have been terminated for refusing to do so. (Holland Decl. ¶¶ 11, 13-14) (ECF No. 52 Ex. 12.)

Priore testified that the Driver Observation form was incorrectly completed (for example, Disciascio allegedly observed Holland from 12:00 to 12:30 p.m., but rated him "unsatisfactory" for two items that could only have been observed first thing in the morning). If it was accurate, however, the ratings reflected that Holland was performing on par with other CCAs. According to Priore, the fact that the 30-day and 60-day evaluations were supposedly completed on the same day "tells me it wasn't done right." While other supervisors testified that there should be only one version of the form, the Secretary has produced three versions of the form. He notes

that the one received by NALC during the grievance process differs from the versions USPS supplied to OSHA (ECF No. 52 Ex. 4) and makes no reference to an April 9th evaluation. None of them are initialed by Holland and only the third version (*id.* Ex. 6) indicates that Holland refused to initial the evaluation.[3]

CCAs are also evaluated on their time management, attendance, work attitude, work behavior, safety and appearance. Other supervisors testified that managers are required to notify employees about observations prior to and after being observed and that, if the CCAs choose not to initial the form because they do not agree with it, the supervisor must mark the form accordingly. The supervisor was also required to put a copy of the observation form on the employee's workstation. (PRDSF ¶¶ 15-17.)

As set forth in its Concise Statement, USPS asserts that probationary employees were expected to be rated as unsatisfactory at the 30-day review, but not at the 60-day review or thereafter. It contends that Disciascio submitted a statement documenting Holland's performance problems and on April 16, 2016, Disciascio recommended to Priore (who was aware of Holland's performance issues) that Holland be separated. Further, USPS contends, a witness interviewed by OSHA during its investigation said that it was known in the office that Holland had a "hard time adapting to certain routes and getting the hang of things," along with casing. Union President Lee agreed that it was expected that at the 60-day mark, a CCA should deliver the mail within the evaluated time on the route and that Holland was "at the end of his probationary period and still learning." Disciascio represented that USPS supervisors want the employees to succeed and "reserve judgment until the end" because "you want the employee to

---

[3] A witness interviewed by an OSHA investigator stated that Disciascio "was often caught in lies" and that he was suspicious when evaluations of Holland that had not existed before suddenly appeared when needed to support Holland's termination. (ECF No. 45 Ex. J at 24.)  Lee also questioned Disciascio's truthfulness. (PRDSF ¶¶ 7-10, 12-14, 98-100.)

have every advantage they have, but so, I would often reserve judgment towards the end of the document." (DSFS ¶¶ 18, 20-22, 24, 27-28, 30.)

The Secretary disputes these facts. He again notes that USPS attempts to rely on Disciascio's "statement," an unsigned document that the Secretary contends is inadmissible. Moreover, Holland states that he never received an evaluation, discipline or write-up while employed with USPS, and the witness who stated that Holland was "having a hard time adapting to certain routes and getting the hang of things" also stated that "that's pretty common for new carriers." Priore never observed Holland delivering mail, never instructed anyone else to observe him, never evaluated his performance and never gave Holland feedback.[4] Holland never received any negative feedback about his performance other than Prozzoly telling him to case mail faster when he first started doing so. Lee testified that management never raised any concerns about Holland to him. The Secretary also asserts that USPS mischaracterizes Lee's testimony about being timely and never stated that Holland was "at the end of his probationary period and still learning." Lee testified that typically, if a probationary employee is receiving an evaluation on day 82, it means the person has made it through probation, but if a CCA is performing poorly, management will notify the union early on and before separating the CCA. (PRDSF ¶¶ 18, 20-22, 24, 27-28, 30, 92-97, 103-04.)

Further, the Secretary asserts, employees who are struggling would not be assigned casing or full routes as Holland was and because of the high rate of CCAs leaving USPS in Pittsburgh, managers were not permitted to terminate CCAs without going to upper management. (*Id.* ¶¶ 106-12.) CCAs are permitted to "hold down" a route after 60 days pursuant to the CBA.

---

[4] The Secretary denies that Priore was even aware that Holland had performance issues because the deposition pages cited by USPS (pp. 15-21) do not support or relate to this fact. This appears to be a typographical error by USPS, however; Priore made this statement on page 35, lines 15-21 of his deposition.

(Defendant's Response to Plaintiff's Statement of Additional Undisputed Material Facts ("DRPSAF") ¶ 110) (ECF No. 54.)

### C.  Events Leading to Holland's Termination

Holland states that, on Saturday, April 16, 2016, he was delivering mail on a new route that was different from the other routes on which he had worked before because there were a lot of businesses and apartment complex. He had not received additional training on this type of work and he was instructed to bring mail back that he had not delivered. (Holland Decl. ¶ 11(n).) (ECF No. 52 Ex. 12.)

According to USPS, on Monday, April 18, 2016, before Holland left to deliver mail, Prozzoly advised him that his performance was poor and that as he was approaching the end of the 90-day probationary period, it was likely that he would be terminated. (DSFS ¶ 31.) In addition to the Secretary's position that USPS relies upon inadmissible documentary evidence to support its position, the document on which USPS relies also states that Prozzoly told Holland that he would be given one more chance for improvement. Moreover, Priore, to whom Prozzoly and Disciascio reported, testified that, as of April 18, he was not planning to fire Holland regarding the fact that Holland brought back and did not deliver mail on April 16 without a pre-disciplinary interview ("PDI") that had not yet been scheduled. (PRDSF ¶¶ 31, 113.)

Sometime later that morning, while delivering mail near 330 Brookside Boulevard, Holland fell and was injured.[5] After attempting to call Priore, Holland sought advice from his union representatives, who informed him that he should request two forms regarding his injury. Holland spoke with Prozzoly on the phone and told him that he had fallen and that he could not

---

[5] USPS states that this occurred "almost immediately after going to the street" (DSFS ¶ 32) but according to the record, Holland started work at 8:00 a.m., began delivering mail at 9:35 a.m. and sustained an injury at 10:27 a.m. (PRDSF ¶ 32.)

continue working. He requested forms CA-1, which is a Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation form and is used by employees to report a work-related injury, and CA-16, which is an Authorization for Examination and/or Treatment form completed by supervisors to guarantee payment to the health care provider if an employee requires medical treatment because of a work-related injury. According to Holland, Prozzoly stated over the phone "are you sure you want to fill one out because you're going to be fired." Prozzoly also instructed Holland to return to the Upper St. Clair office. (PRDSF ¶¶ 77-85.)[6]

Upon Holland's arrival, Prozzoly did not observe any sign of an injury to Holland's knee or leg, although he observed that Holland was limping. (DSFS ¶ 33; PRDSF ¶ 33.) Holland once again requested the forms and Prozzoly again asked Holland whether he was sure he wanted to report his injury and complete the requested forms because if he did so he would be fired. Holland confirmed that he wished to do so, and Prozzoly told Holland to turn in his badge and told him that he was fired. (PRDSF ¶¶ 86-88.) Prozzoly testified that he "would never suggest someone get fired because of an injury." (DRPSAF ¶¶ 84, 87.) Later that day, NALC president Lee emailed USPS upper management to complain about firing Holland after he reported an injury and noted that management's actions violated the law. (PRDSF ¶ 91.)[7]

After turning in his badge, Holland called his parents to pick him up, and then went to obtain medical treatment. Holland suffered a tibial plateau fracture, cartilage damage and a torn MCL as a result of his fall on April 18, 2016. (PRDSF ¶¶ 89-90.)

---

[6] USPS denies some of these statements but cites no record evidence in support for its denial. (DRPSAF ¶¶ 77-79, 81, 84-85.)

[7] USPS denies some of these statements but cites no support in the record for its denial. (DRPSAF ¶¶ 86-90.) Although USPS denies that Prozzoly fired Holland on April 18, the record includes an April 18 email in which Prozzoly told Priore and others that Holland "has been let go" and that "I do not believe he fell and at the time he came back, I got his badge from him and told him I was letting him go." (ECF No. 45 Ex. P.)

Holland's accident was suspicious to USPS management due to its proximity to Prozzoly's warning to Holland that he was likely to be terminated. Prozzoly also reviewed with Priore, Gless and Gerst Holland's litany of performance problems, including bringing back mail while assigned to another station, returning late from his route with undelivered mail, and failing to deliver to businesses first, as a result of which they were closed by the time he got there. Priore agreed that the separation of Holland was appropriate for performance issues, particularly because he brought back a large amount of mail. Union President Lee confirmed that he specifically tells CCAs not to bring back mail. (DSFS ¶¶ 26, 29, 34.)

While acknowledging that Priore testified that Holland was terminated because he brought back mail on April 16, the Secretary notes that Priore admitted that he did not see Holland bring back mail and was not planning on firing Holland on April 18 without having a PDI, which he had not yet scheduled, to determine what had happened. Holland testified that he brought back mail on April 16 because Disciascio instructed him to do so. (PRDSF ¶¶ 26, 34.) Lee also testified that there are occasions when bringing back mail is "unavoidable." (*Id.* ¶ 29.) Moreover, bringing back mail one time is not enough to terminate a probationary employee. (PRDSF ¶¶ 114-15.)[8]

### D. Holland's Termination Letter

On April 20, 2016, Disciascio wrote a Letter of Separation While in Probationary Period terminating Holland based on "unsatisfactory performance." (DSFS ¶ 25; ECF No. 45 Ex. L.) Holland was given this letter on April 22, 2016. The Secretary maintains, however, that the evidence reflects that Holland was verbally fired on April 18, 2016, immediately after he

---

[8] USPS denies this statement but fails to cite to evidence in the record as support for its denial.

attempted to report his injury to Prozzoly. (PRDSF ¶ 25.) Holland's probationary period was due to end on April 22, 2016. (PRDSF ¶ 117.)

### E.  OSHA's Involvement

On or about April 21, 2016, the day before he was given a termination letter, Holland initiated a complaint with OSHA alleging that USPS discriminated against him in violation of Section 11(c)(1) of the Act. USPS was notified of the Complaint by OSHA the same day. On May 9, 2016, USPS responded to the complaint, explaining that Holland was separated due to performance issues, not because he reported a work-related injury.

According to USPS, more than two years later, OSHA re-initiated an investigation into the complaint. On May 22, 2018, OSHA sent a subpoena to USPS. OSHA sent a letter to Holland on June 5, 2018, stating in part that "Respondent has defended its position by presenting a nondiscriminatory reason for their actions, to include supporting documentation."[9]

On January 29, 2020, almost four years after the alleged retaliatory activity, the Secretary filed the instant Complaint. (DSFS ¶¶ 35-41.) The Secretary disputes that OSHA "re-initiated" the investigation, noting that, prior to April 11, 2018 when the investigation was assigned to an OSHA investigator, a Regional Supervisory Investigator received position papers and rebuttals. (PRDSF ¶¶ 38, 47, 121-22.)

The parties dispute OSHA's obligations in these circumstances. USPS states that, according to Region III Supervisory Investigator Jack Rudzki, OSHA is required to follow the OSHA Whistleblowers Manual during the Section 11(c) investigation process. The Manual sets forth the requirements and expectations concerning the completion of investigations. USPS

---

[9] The Secretary contends that because this letter is hearsay it cannot be cited for the truth of the matter asserted. In addition, this was not a final OSHA agency decision or official statement. (PRDSF ¶ 40.)

contends that the requirements and expectations for the timing of the completion of investigations are also statutory in nature. Title 29 U.S.C. § 660(c)(3) states, "[w]ithin 90 days of the receipt of a complaint filed under this subsection the Secretary shall notify the complainant of his determination under paragraph (2) of this subsection." Pursuant to OSHA policies, an OSHA 11(c) investigation should be completed within 90 days.

According to USPS, the OSHA investigation took more than 32 months to complete, beginning on April 21, 2016 and concluding in December 2018. Rudzki claims that the delay, which was 10 times the statutory requirement, was due to a "resource issue within OSHA." Rudzki admitted that the investigation just "sat" for a lengthy period of time. (DSFS ¶¶ 42-49.)

The Secretary asserts that the Whistleblowers Manual states that it is "intended to provide instruction regarding some of the internal operations of [OSHA], and is solely for the benefit of the Government. No duties, rights, or benefits, substantive or procedure, are created or implied by" the manual. (PRDSF ¶ 42.) He further notes that federal regulations specifically provide that the 90-day provision in Section 11(c)(3) is "considered directory in nature. (*Id.* ¶¶ 44, 46; see 29 C.F.R. § 1977.16.) The Secretary also disputes that the investigation began on April 21, 2016. Rather, the complaint was assigned to Investigator Edward Rhoades on April 11, 2018 and the investigation took about eight months. (*Id.* ¶¶ 47-48, 123.) According to the Secretary, Rudzki did not testify that the investigation sat for a lengthy period of time, but that, after receiving the complaint, the position paper and complainant's rebuttal, the case "sits in the queue" until it can be assigned to an investigator. There is a backlog that delays the assignment of cases to investigators. (*Id.* ¶ 49.) Region III receives over 500 complaints every year, but has only seven investigators, creating a serious backlog,[10] investigates the oldest cases first and before assigning

---

[10] USPS denies this statement, citing a page of Rhoades's deposition in which he stated that he

a case to an investigator, the Regional Supervisory Investigator receives position papers and rebuttals. (PRDSF ¶¶ 49, 118-22.)

The Secretary also contends that USPS is responsible for much of the delay in the investigation. On April 17, 2018, Rhoades notified USPS that he was the investigator assigned to investigate Holland's complaint and contacted USPS's counsel numerous times requesting information and documents as part of the investigation into the claim but its counsel did not respond. OSHA issued a subpoena duces tecum to USPS on May 22, 2018, but USPS did not produce documents in response to OSHA's subpoena duces tecum until August 9, 2018. Between August 30, 2018 and November 15, 2018, Rhoades made multiple attempts to obtain from USPS's counsel the contact information of several fact witnesses and to coordinate and schedule witness interviews with USPS's counsel, but its counsel did not respond in a timely or complete fashion. (PRDSF ¶¶ 124-33.)[11]

This lawsuit was filed thirteen months after the investigation was completed. According to USPS, Rhoades admitted during his deposition that a two-year delay in an investigation may cause "investigations to go stale, memories to fade, resources to become problematic, and difficult[y] to track people down… people pass away… people change jobs, change addresses, move." USPS contends that that this occurred here. At the deposition of Doug Prozzoly on March 1, 2021, it was clear that his memory was impacted by the five-year gap in time between the incident and his deposition. Prozzoly stopped working for USPS in January 2019 and not only had a poor recollection of the incident in question, but also of the overall procedures in

---

has worked for two different regions, one of which has a serious backlog and the other of which does not. (DRPSAF ¶ 120.) Given that Rhoades unequivocally testified that Region III has a serious backlog (Rhoades Decl. ¶ 8) (ECF No. 52 Ex. 16), there appears to be no ambiguity about this fact.

[11] USPS denies some of these statements (DRPSAF ¶¶ 126, 130, 131-33), but fails to cite any support for its denials.

effect during relevant times. Witness Kevin Kline had difficulty recalling details of the events surrounding the alleged incident. Disciascio also had issues recalling specific facts and events. Union President Lee admitted that his recollection was affected because the matter occurred in 2016. In relation to the alleged incident where Holland was injured, an eyewitness passed away prior to USPS being able to contact him or interview him. Moreover, Holland's damages increased exponentially during the period of delay by Plaintiff. (DSFS ¶¶ 50-60.)

The Secretary asserts that issues about delay are irrelevant to the issues in this case, which concern Holland's protected activity, USPS's retaliatory actions and the proffered reason for the adverse action. Moreover, the Secretary contends, Rudzki did not admit there was a four-year delay in OSHA's investigation and USPS has overstated any effect that the passage of time may have had on witness testimony. (PRDSF ¶¶ 50-60.)

USPS also contends that OSHA also failed to follow its own policy when it failed to engage USPS in settlement negotiations. Pursuant to the OSHA Whistleblowers Investigation Manual, "[i]t is OSHA policy to seek settlement of all cases determined to be meritorious prior to referring the case for litigation." When questioned about the reason that OSHA did not attempt settlement in relation to this matter, Investigator Rhoades stated that "settlement wasn't an option" and this decision was a "regional or program decision." Rudzki admitted that if someone instructed OSHA Investigator Rhoades not to settle the case, that would violate OSHA policy. (DSFS ¶¶ 61-64, 66-68.)

The Secretary disputes these statements, noting that the manual clarifies that efforts to seek settlement shall be for "complaints in which both parties seek it" and those which "provide fair and equitable relief for the complainant and are consistent with public policy." Thus, OSHA does not seek settlement of all cases. Rhoades and Rudzki were not speaking on behalf of OSHA

but in their individual capacities and Rudzki did not testify that it would "violate" OSHA policy not to settle, only that it would be "inconsistent," and that he had no knowledge of anyone instructing Rhoades not to settle the case. (PRDSF ¶¶ 61-64, 66-68.)

## III.   Discussion

### A.  Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the lack of a genuine issue of material fact.

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's

favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**B.  Section 11(c) Claims**

Plaintiff asserts a claim under Section 11(c), which provides that:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1).[12] *See also* 29 C.F.R. § 1904.35 (employers "must not discharge or in any manner discriminate against any employee for reporting a work-related injury or illness."); 29 C.F.R. § 1904.36 ("section 11(c) of the OSH Act also prohibits [employers] from discriminating against an employee for reporting a work-related fatality, injury, or illness. That provision of the Act also protects the employee who files a safety and health complaint, asks for access to the part 1904 records, or otherwise exercises any rights afforded by the OSH Act.")

1.  Laches

USPS argues that the doctrine of laches precludes the Secretary from obtaining relief in this case, or alternatively, limits the relief that may be available.

The OSH Act provides that an aggrieved employee should notify the Secretary within 30 days of the adverse action and the Secretary may bring an action in federal court to remedy the situation. 29 U.S.C. § 660(c)(2).[13] The Secretary has 90 days to investigate and inform the employee of the determination concerning the matter. § 660(c)(3). However, the Act "does not specify any time in which suit must be brought." *Donovan v. Square D Co.*, 709 F.2d 335, 336

---

[12] Although the Act does not apply to the federal government, it does apply to USPS. 29 U.S.C. § 652(5). *See Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168, 1183 (W.D. Wash. 2015).
[13] The Act does not create a private civil remedy. *See Taylor v. Brighton Corp.*, 616 F.2d 256, 262 (6th Cir. 1980); *George v. Aztec Rental Ctr. Inc.*, 763 F.2d 184, 186 (5th Cir. 1985).

n.3 (5th Cir. 1983).

USPS acknowledges that the Act does not require suit to be brought within a specific time period, but nevertheless argues that "the 90-day completion mandate is indicative of a reasonable time frame." (ECF No. 43 at 11.) As noted above, however, this time frame is "merely directory because instances will of course occur where the 90-day period cannot be met." *Marshall v. N. L. Indus., Inc.*, 618 F.2d 1220, 1224 (7th Cir. 1980) (citing 29 C.F.R. § 1977.16). Thus, courts have rejected the argument that a complaint should be deemed untimely because the Secretary's investigation exceeded the 90-day time frame in the statute. *See Secretary of Lab. v. Niles Fam. Dentistry Assocs., Inc.*, 2012 WL 3913032, at *4 (N.D. Ohio Sept. 7, 2012) ("to dismiss the instant action at the behest of Defendant due to the Labor Secretary's alleged non-compliance with what appears to be a directory provision promulgated to protect complainant's rights would be drastic in nature and doctrinally unsound."); *Donovan v. Freeway Const. Co.*, 551 F. Supp. 869, 878 (D.R.I. 1982) (same). *See also Brock v. Pierce Cty.*, 476 U.S. 253, 259 n.6 (1986) (citing *N.L. Industries* in concluding that another statute similarly stating that the Secretary "shall" issue a final determination within 120 days did not preclude a subsequent action if the 120-day period expired).

As stated by the United States Supreme Court, "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). "Both before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief." *Id.* (footnote omitted).[14] "As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by

---

[14] The Secretary requests both legal and equitable relief in this action. (Compl. at 5-6.)

it to enforce a public right or protect a public interest." *U. S. Immigr. & Naturalization Serv. v. Hibi*, 414 U.S. 5, 8 (1973). *See also United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights.")

Courts that have examined this issue have determined that Section 11(c) cases further both public and private interests. *See Square D*, 709 F.2d at 340-41; *Marshall v. Intermountain Elec. Co.*, 614 F.2d 260, 262-63 (10th Cir. 1980). The Act itself indicates that its primary goals are public in nature, namely "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). In addition, as noted above, Section 11(c) does not contain any private right of action. *See George,* 763 F.2d at 186. *See also Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 368 (1977) (when the Equal Employment Opportunity Commission brings suit on behalf of employees whose rights have been violated, "the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties.")

At least two courts have held that laches can never be applied against the Secretary in a Section 11(c) case. *See Acosta v. Jardon & Howard Techs., Inc.*, 2018 WL 5779506, at *2 (E.D.N.C. Nov. 2, 2018); *Dunlop v. Bechtel Power Corp.*, 1977 WL 18843, at *2 (M.D. La. Dec. 21, 1977). Other courts have acknowledged their discretion to apply the doctrine of laches if the government has engaged in unreasonable delay that results in prejudice to the employer, but have declined to apply the defense, particularly when the employer was notified promptly about the existence of the claim. *See Square D*, 709 F.2d at 339-40 & nn.10, 11; *Perez v. Eastern Awning Sys., Inc.*, 2018 WL 4926447, at *2-3 (D. Conn. Oct. 10, 2018); *Donovan v. Diplomat Envelope Corp.*, 587 F. Supp. 1417, 1423 (E.D.N.Y. 1984).

USPS has not identified any case in which a court has barred a Section 11(c) suit based on the doctrine of laches. In fact, the only two cases it cites involved claims brought by the EEOC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, in which the court found that there was no inexcusable delay or prejudice. *See E.E.O.C. v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 81 (3d Cir. 1984); *E.E.O.C. v. LogistiCare Sols. LLC*, 2020 WL 6781270, at *2 (D. Ariz. Nov. 18, 2020).[15]

In *Occidental Life*, the Supreme Court found that "Congress did express concern for the need of time limitations in the fair operation of the Act, but that concern was directed entirely to the initial filing of a charge with the EEOC and prompt notification thereafter to the alleged violator." 432 U.S. at 371-72.[16] Similarly, employees must promptly file Section 11(c) claims with OSHA and "the Secretary routinely contacts the employer during the 90-day investigative period, during which company management is interviewed. The company is therefore alerted to possible litigation and given an early opportunity to gather and preserve evidence." *Square D*, 709 F.2d at 339 n.10. Therefore, the "most reasonable inference to draw is that Congress desired expeditious action at the outset of proceedings to preserve the parties' interests, yet in recognition of both the need for agency flexibility and the reality of administrative backlog, Congress elected to forego placing an inflexible timetable upon the Secretary for bringing suit." *Id.* at 339. Thus, a strong argument can be made that applying laches to preclude a Section 11(c)

---

[15] The issue of whether laches may be applied against the EEOC has never been resolved. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 n.14 (2002) (declining to address "whether the laches defense may be asserted against the EEOC, even though traditionally the doctrine may not be applied against the sovereign.")

[16] The Court ultimately concluded that "when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief." *Id.* at 373. The court in *Intermountain* understood this finding to mean that, in Section 11(c) cases, "the doctrine of laches may be applied in these hybrid cases to limit relief." 614 F.2d at 263.

suit would contravene public policy and Congressional intent.

Nevertheless, even if the doctrine of laches could be applied, USPS would have to demonstrate that it is appropriate in this case. "Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (citation omitted).

USPS argues that laches should apply because OSHA took four years to conduct its investigation and file suit. During this time period, one witness died, others indicated that they could not remember the events in question and the two managers involved left USPS to pursue other careers. USPS also asserts that it has been prejudiced by the accrual of backpay damages during the delay in bringing suit.

As noted above, USPS cites no decisions that have found that similar delays are "inexcusable" or that the employer suffered prejudice as a result. Indeed, there is authority to the contrary. *See LogistiCare Sols.*, 2020 WL 6781270, at *2 (concluding that seven-year delay in bringing suit was not sufficient to invoke laches—the "essential element" of which is prejudice—and noting that, "[b]ecause the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment."); *Eastern Awning*, 2018 WL 4926447, at *4-5 (six-year delay not unreasonable or inexcusable when OSHA continued to investigate the complaint until it brought suit and employer did not suffer prejudice when it received timely notice of the complaint); *Perez v. Renaissance Arts & Educ., Inc.*, 2013 WL 5487097, at *6 (M.D. Fla. Sept. 30, 2013) (two-and-a-half years not excessive delay); *Diplomat Envelope Corp.*, 587 F. Supp. at 1423 (no prejudice when defendants were notified of claim less than two months after the discriminatory discharge). *See also E.E.O.C. v. Jacksonville Shipyards, Inc.*, 690 F. Supp. 995, 999-1000 (M.D. Fla. 1988) (EEOC's

filing of suit six years and ten months after the filing of was not undue delay given prompt notification to defendant, another agency's audit of the company and EEOC's continuing involvement in the process).

Here, Holland filed a Section 11(c) complaint on April 21, 2016 and USPS received notice of it the same day. It took about two years for the case to be assigned to an investigator and approximately eight months for the investigation to be completed. Although the Secretary acknowledges that delays occurred, OSHA had only seven investigators to investigate approximately 500 cases per year, which created a significant backlog. There is also evidence that OSHA utilized the Regional Supervisory Investigator to assist prior to the case being assigned to an investigator and that USPS's own unresponsiveness and evasiveness during the investigation caused some of the delay. Thus, the four-year delay in bringing suit alone does not demonstrate inexcusable delay under the facts of this case, particularly because USPS had notice of the claim the day it was filed, and presumably, could have conducted its own investigation immediately.

Although several witnesses no longer work for USPS, "the mere assertion that these persons are not presently with the company is insufficient to support a finding of prejudice. [The employer] must also show that they are unavailable to testify." *Fowler v. Blue Bell, Inc.*, 596 F.2d 1276, 1279 (5th Cir. 1979). *See also LogistiCare Sols.*, 2020 WL 6781270, at *3 ("LogistiCare must show that the witnesses are unavailable and that their unavailability is a result of the EEOC's delay.") (citing *Great Atl. & Pac. Tea Co.*, 735 F.2d at 84). USPS has not argued that the two managers who no longer work for USPS are unavailable; indeed, both were deposed in this case. And as mentioned, nothing prevented USPS to conduct interviews of its own employees and thus, preserve this evidence given its contemporaneous knowledge that

Holland had filed a complaint.

USPS suggests that the mere passage of time has had a "deleterious effect" on witnesses' memory. However, this fact alone is not enough to establish prejudice unless the missing evidence "would contradict, or even meaningfully supplement, the evidence already in the record." *Eastern Awning*, 2018 WL 4926447, at *5. USPS has not explained how any evidence that now may be unavailable would meaningfully contradict or supplement the evidence that has been developed in this case.

Finally, USPS points to the accrual of back pay during the delay as evidence of prejudice. However, "[t]he mounting of penalties during periods of noncompliance is a response to unlawful conduct, not a form of 'prejudice' that permits the wrongdoer to get away scot free." *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 418 (7th Cir. 1995) (citation omitted). *See also LogistiCare Sols.*, 2020 WL 6781270, at *4 ("back pay is not enough to show prejudice on its own as this Court has the power to take the EEOC's delay into account when crafting a remedy.")

Thus, because USPS has not demonstrated the existence of inexcusable delay or prejudice, the doctrine of laches will not be applied.

In the alternative, USPS requests that backpay and interest be limited such that it ceases at the point in time when the Secretary had sufficient information to bring the complaint. Courts have held, however, that "[t]hat question should not be answered prior to receipt of proof on the issue of remedy." *Jacksonville Shipyards,* 690 F. Supp. at 1001 (citing *Occidental Life*, 432 U.S. at 373; *Great Atl. & Pac. Tea Co.*, 735 F.2d at 84-85; *EEOC v. American National Bank*, 574 F.2d 1173, 1174-75 (4th Cir. 1978)). Thus, it is premature to resolve whether backpay should be limited in this case but USPS may raise this issue at a later time.

2.  <u>Analysis of Section 11(c) Claim</u>

Although the Court of Appeals for the Third Circuit has not addressed the issue, numerous other courts have held that Section 11(c) claims follow the format for claims under Title VII's anti-retaliation provision, § 2000e-3(a). *See Acosta v. Lloyd Indus., Inc.,* 291 F. Supp. 3d 647, 653 (E.D. Pa. 2017) (citing *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir. 1994); *Kennard v. Louis Zimmer Commc'ns, Inc.*, 632 F. Supp. 635, 638 (E.D. Pa. 1986)). *See also Solis v. Blue Bird Corp.*, 404 F. App'x 412, 413 n.2 (11th Cir. 2010); *Eastern Awning,* 2018 WL 4926447, at *5; *Perez v. Champagne Demolition, LLC,* 2016 WL 3629095, at *3 (N.D.N.Y. June 29, 2016); *Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168, 1187 (W.D. Wash. 2015). The parties agree that that this analysis applies to this case. (ECF No. 43 at 4; ECF No. 50 at 6.)

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly by following the shifting burden analysis set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

a.  Prima Facie Case

As summarized by the Court of Appeals for the Third Circuit, the prima facie case elements for a retaliation claim are as follows: 1) the employee engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the employee's opposition to or participation in proceedings against unlawful

discrimination and the employer's action. *Moore v. City of Philadelphia,* 461 F.3d 331, 341-42 (3d Cir. 2006). The Supreme Court has held that retaliation must be proved by but-for causation. *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). *See also* 29 C.F.R. § 1977.6(b) ("If the discharge or other adverse action would not have taken place 'but for' engagement in protected activity, section 11(c) has been violated.")

For purposes of a prima facie case of retaliation, however, a plaintiff need only proffer sufficient evidence to raise the inference that the protected activity was the likely reason for the adverse employment action, not the but-for reason. *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249 (3d Cir. 2017).[17]

USPS concedes that Holland "arguably" engaged in protected activity by reporting an injury and suffered an adverse employment action when he was terminated. (ECF No. 43 at 5.) It contends, however, that the Secretary cannot demonstrate a causal link between these events, despite the fact that they occurred within a few days of each other, because of the pending conclusion of Holland's probationary period. USPS argues that, because Holland would have been terminated on April 22, 2016, in any event based on his history of poor performance, he cannot link his termination to the workplace injury that occurred few days before. It cites no authority for this proposition, however, and the passage of two days between protected activity and the adverse employment action is "unduly suggestive." *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (employee fired two days after protected activity established unduly suggestive temporal proximity from which causation could be inferred). Moreover, the Secretary has offered evidence that Holland was verbally terminated by Prozzoly as soon as he attempted

---

[17] USPS states that it "believes [the *Carvalho-Grevious* decision] incorrectly applies the Supreme Court's decision in *Nass[a]r*, and that Plaintiff herein cannot establish but-for causation, necessary for his *prima facie* case." (ECF No. 43 at 5 n.2.) This Court is required to follow the Third Circuit's decision regardless of USPS's belief that it was incorrect.

to report a workplace injury on April 18. Thus, this disputed fact must be resolved by the jury.

By arguing that the Secretary has not shown that USPS's decision was motivated by retaliation, USPS is attempting to force the Secretary to prove that Holland was discriminated against in order to state a prima facie case. However, requiring the Secretary to rebut USPS's stated reason for terminating Holland in order to establish a prima facie case of discrimination improperly imports the later stages of the *McDonnell Douglas* test into the prima facie analysis.

As cogently explained by the Sixth Circuit:

> a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

*Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)). *See also Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises serious problems under the *McDonnell Douglas* framework because it frustrates a plaintiff's ability to establish that the defendant's reasons were pretextual."); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action–in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie case is not so onerous.")

Therefore, the Court concludes that the Secretary has established a prima facie case of retaliation discrimination. The burden of production then shifts to USPS to articulate a

legitimate, non-discriminatory reason for its action. USPS has proffered as its legitimate, non-discriminatory reason for Holland's termination his ongoing poor performance. Thus, USPS has satisfied its relatively light burden of production. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).

Therefore, the burden shifts to the Secretary to proffer evidence from which the trier of fact could conclude that USPS's reason is a pretext for unlawful retaliation discrimination.

b. Pretext Analysis

The Court of Appeals has explained that:

> To discredit the employer's proffered reason … the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).

"A plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII." *Carvalho-Grevious*, 851 F.3d at 257-58. "To prove a 'determinative effect,' the plaintiff must show by a preponderance of the evidence that there is a 'but-for' causal connection between the adverse employment action and retaliatory animus." *Id.* at 258 (citations omitted).

The Secretary proceeds along "*Fuentes* prong one" by arguing that the record contains evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en

banc).[18] As he argues, USPS has offered inconsistent reasons for Holland's termination. First, USPS contends that Holland was terminated for poor performance as documented on the Driver Observation form and Employee Evaluation form, both allegedly completed by Disciascio on April 9. But as described above, it is disputed that these forms were actually completed by Disciascio that day or any other day prior to Holland's termination. In addition, it is unclear why Holland was not terminated on April 9 if his performance was so poor, or why his alleged poor performance was not mentioned in the April 18 email that Prozzoly sent to his superiors after Holland reported an injury and Prozzoly told him he was terminated. There is also record evidence that Holland was performing on par with other CCAs and if he had been struggling either he or USPS management would have informed the union but no one did. Further, the record includes evidence that USPS would not wait until the end of a CCA's probationary period to terminate him if he was performing poorly.

USPS has also suggested that it terminated Holland because he brought back mail on April 16, even though it conceded that bringing back mail one time, which Holland stated that he did at Disciascio's instruction, is not enough to terminate a probationary employee. Priore acknowledged that he would not have terminated Holland based on this incident without conducting a PDI to discover what had occurred, and yet, no PDI had been scheduled. USPS also has referred to Holland being 30 minutes behind one time and not casing fast enough when he first started this activity, but USPS management admitted that being 30 minutes late one time is insufficient to terminate a probationary employee and casing mail is not something CCAs are expected to master during their probationary period.

---

[18] In a case utilizing "*Fuentes* prong two," the plaintiff argues that the record contains evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 1111.

Finally, USPS points to evidence that Prozzoly told Holland on the morning of April 18 that his performance was poor and he would likely be terminated. But as the Secretary notes, in the document on which USPS relies (ECF No. 45 Ex. N), Prozzoly indicated that Holland would be given one more opportunity for improvement and yet, after Holland reported an injury a few hours later, Prozzoly terminated his employment and wrote that "I do not believe that he fell" (*id.* Ex. P). This sequence of events could suggest that Prozzoly fired Holland (although it is undisputed that he did not have the authority to do so) *because* he concluded that Holland was lying about his injury. *See also* ECF No. 52 Ex. 2 (April 18 email in which Priore stated that Holland was unable to identify the address where the injury occurred and that "when asked what he fell on he said wet grass. Last time I checked the grass is wet every morning, something called dew. No question in my mind that this whole thing was staged.");[19] Ex. 13 (April 21 email in which Priore stated that Holland "reported an accident which we believe is fraudulent.") USPS does not contend that that this was the reason, nor has it explained how Prozzoly could have conclusively made this determination without further information. In addition, there is record evidence that Holland did, in fact, sustain a tibial plateau fracture, cartilage damage and a torn MCL.

In response to evidence that neither Holland nor NALC ever received the evaluations of Holland that Disciascio allegedly completed, USPS asserts that whether the union received them is "completely meaningless" (ECF No. 53 at 2) and whether Holland received them "is of no moment because it is Defendant's state of mind that is at issue, not Mr. Holland's" (*id.* at 3.) USPS misses the point. The Secretary has proffered evidence that USPS's reason "was either a

---

[19] However, the email also stated that Priore was following the advice of the HR Manager: "wait for him to return the CA-1 and process the injury but he will probably make it through his probation."

post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764. That is, if neither Holland nor the union ever received copies of the alleged evaluations until the case was under investigation (and which included unexplained inconsistencies), this raises an issue of fact of whether the basis for the decision to terminate Holland was based on poor performance or whether USPS created a post hoc fabrication. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) (when employee never received any unfavorable criticism, employer's reliance on poor performance constituted a jury question). Moreover, USPS did not terminate Holland on April 9 (when his poor performance was allegedly documented) or even on April 16 (when he brought back mail), but on April 18, immediately after he fell and requested forms for reporting his injury.

As the Secretary argues, pretext can be established through evidence that an employer deviated from established policy or practice. "A violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000) (citation omitted). In addition: "If a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001).

USPS notes that no comparator has been identified. However, there are a number of issues of fact as to whether Holland was performing poorly, including the fact that neither he nor the union received copies of the alleged evaluations until this case was being investigated; the inconsistencies on the forms themselves; and the discrepancy between the message sent by

Prozzoly on April 18 and the letter given to Holland on April 22. There is also evidence that some probationary employees who were struggling (but who presumably did not report an injury) were retained or had their probationary periods extended, although these employees are not identified.

At any rate, the Court need not resolve this issue because a plaintiff asserting a retaliation claim is not required to identify comparators to demonstrate pretext. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (listing multiple ways a plaintiff can show pretext, one of which is the use of comparators). *See Lloyd Indus.*, 291 F. Supp. 3d at 659 n.8 ("because I find that the Secretary has put forward sufficient evidence from which a jury could infer pretext, it is not fatal that he has failed to identify comparators.") Thus, based on evidence in the record from which a jury could infer pretext, lack of comparators is not relevant or fatal to the Secretary's claims.

## IV.    <u>Conclusion</u>

For the reasons explained above, USPS's motion for summary judgment will be denied. An appropriate order follows.


Dated: March 31, 2022                                    BY THE COURT:


                                                         <u>s/ Patricia L Dodge</u>
                                                         PATRICIA L. DODGE
                                                         United States Magistrate Judge